896 F. Supp. 1248

NACCO MATERIALS HANDLING GROUP, INC., INDEPENDENT LIFT TRUCK BUILDERS UNION, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, INTERNATIONAL UNION, ALLIED INDUSTRIAL WORKERS OF AMERICA (AFL-CIO), & UNITED SHOP AND SERVICE EMPLOYEES, PLAINTIFFS *v.* UNITED STATES, DEFENDANT, AND TOYOTA MOTOR SALES, U.S.A., INC., DEFENDANT-INTERVENOR

Court No. 94–02–00096

(Dated July 26, 1995)

*Collier, Shannon, Rill & Scott (Paul C. Rosenthal, Mary T. Staley,* and *David C. Smith, Jr.),* for plaintiffs.

*Frank W. Hunger,* Assistant Attorney General, *David M. Cohen,* Director, Civil Division, Commercial Litigation Branch, United States Department of Justice *(Michael S. Kane), Priya Alagiri,* Attorney-Advisor, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, for defendant.

*Dorsey & Whitney (John B. Rehm, Munford Page Hall, II,* and *L. Daniel Mullaney),* for defendant-intervenor Toyota Motor Sales, U.S.A., Inc.

OPINION

CARMAN, *Judge:* Plaintiffs NACCO Materials Handling Group, Incorporated, Independent Lift Truck Builders Union, International Association of Machinists and Aerospace Workers, International Union, Allied Industrial Workers of America (AFL-CIO), and United Shop and Service Employees (collectively "plaintiffs") have moved for judgment upon the agency record to contest certain aspects of the United States Department of Commerce's ("Commerce" or "Department") *Certain Internal-Combustion Industrial Forklift Trucks From Japan,* 59 Fed. Reg. 1374 (Dep't Comm. 1994) (final results) *(Final Results).* Plaintiffs request the Court remand the action to Commerce for a redetermination. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (1988).

## BACKGROUND

On January 10, 1994, Commerce published the final results of its June 1, 1989, through May 31, 1990, administrative review of the anti-dumping duty order on certain internal-combustion, industrial forklift trucks[1] from Japan. *See Final Results,* 59 Fed. Reg. at 1374. This review covered sales made by Toyota Motor Corporation (Toyota).[2] *Id.* at 1375.

During the period of review, Toyota's U.S. selling division, defendant-intervenor Toyota Motor Sales, U.S.A., Incorporated (TMS), sold Toyota's forklift trucks in the United States to dealers. *Id.* at 1379. The dealers sold the forklift trucks to end-users. *Id.* A related finance company, Toyota Motor Credit Corporation (TMCC), served as a source of financing to both dealers and end-users for their forklift truck purchases. *Id.* In its antidumping calculations for Toyota in the administrative determination under review, Commerce based U.S. price on the price to the first unrelated purchaser in the United States. *Id.* Thus, Commerce based Toyota's U.S. sales price on the price Toyota's U.S. selling division, TMS, charged unrelated dealers. *Id.*[3]

Toyota claimed credit revenue for its U.S. sales. *Id.*[4] This credit revenue consisted of revenue TMCC received from both unrelated dealers[5] and unrelated end-users[6] as a result of financing TMCC supplied. Id.[7] Commerce allowed the inclusion of revenue received from unrelated dealers, but disallowed revenue received from unrelated end-users. *Id.* Commerce explained that because it had based U.S. price on the price

---

[1] For a further description of the products under review, see *Final Results,* 59 Fed. Reg. at 1374–75.

[2] Commerce also reviewed sales made by Toyo Umpanki Company, Ltd. (Toyo) for the same period. *Final Results,* 59 Fed. Reg. at 1375. Issues relating to Commerce's review of Toyo were originally challenged in this proceeding. On September 7, 1994, however, a consent motion was entered remanding the *Final Results* to Commerce with an order to correct two clerical errors in the dumping calculations for Toyo. *See NACCO Materials Handling Group, Inc. v. United States,* No. 94–02–00096 (CIT entered Sept. 7, 1994, signed Sept. 6, 1994) (order remanding to Commerce). On remand, Commerce recalculated the weighted-average dumping margin for Toyo and changed that margin from 4.48% to 13.78%. *See* Final Results of Redetermination Pursuant to Court Remand, *NACCO Materials Handling Group, Inc. v. United States,* No. 94–02–00096 (Oct. 7, 1994). On November 18, 1994, this Court granted plaintiffs' consent motion to affirm the results of the redetermination and dismiss the remaining issues related to Toyo in this case. *See NACCO Materials Handling Group, Inc. v. United States,* No. 94–02–00096 (CIT Nov. 18, 1994) (affirming remand and dismissing Toyo issues). The Court's November 18, 1994, order further directed Commerce to direct the Customs Service to liquidate all of Toyo's entries at a final dumping rate of 13.78%. *Id.* at 2.

[3] In the *Final Results,* Commerce explains Toyota's U.S. price "was based on the price TMS/TIE charged its unrelated dealers." *Final Results,* 59 Fed. Reg. at 1379. TIE is the Toyota Industrial Equipment Division of TMS. *Id.* at 1378.

[4] At oral argument before this Court, Commerce explained the mechanics of this adjustment as follows To account for differences between circumstances of sales in the United States and foreign markets, Commerce adjusts foreign market value pursuant to 19 U.S.C. § 1677b(a)(4)(B) (1988). One potentially adjustable circumstance is credit expense. As counsel for defendant explained to this Court:

[Y]ou're trying to find credit expenses that exist on one side that don't exist on the other side, and in order to do that * * * Commerce determines that the seller of merchandise on the United States side incurs an expense due to the fact that payment exists solely in the form of an account receivable until payment is made upon the arrival of the goods after the merchandise is shipped. So during the lag period between the shipment of the merchandise and payment for the merchandise, under Commerce's economic theory the seller is incurring a credit expense.

(Tr. at 39–40 ) A credit revenue or interest income offset is an offset to credit expense.

[5] Toyota referred to this as "wholesale" financing. *(See* Def.-Intervenors' Resp. at 2.)

[6] Toyota referred to this as "retail" financing. *(See* Def.-Intervenors' Resp. at 3.)

[7] Defendant-intervenor explains the claimed credit revenue to this Court as follows:

[I]f the amount due from a customer was $10,000 for immediate payment and $10,200 for payment in 90 days, and the customer paid in 90 days, Toyota reported a U.S. price of $10,200. In such a case, $200 of the $10,200 is credit revenue, i.e., that part of the price which is due to the 90-day delay in payment. The Department deducts credit expense for the 90 days that payment is outstanding, calculating such expense using the daily short-term interest rate applied to the 90 days that payment is outstanding.

(Def.-Intervenors' Resp. at 2 n.1.)

TMS charged to unrelated dealers, Commerce considered "revenue generated as a result of the sale by the dealer to the end-user through a financing arrangement a separate transaction, and as such, not directly associated with the sales under review." *Id.*

During the administrative review at issue, plaintiffs also urged Commerce to consider costs allegedly incurred by Toyota in retrofitting its forklifts with redesigned seats under an operator restraint safety seat program (ORS program) as direct U.S. selling expenses. *Id.* at 1378. Toyota argued that any costs incurred due to the retrofit were only for forklifts imported and sold prior to the period of review. *Id.* In the *Final Results,* Commerce concluded "there [was] no evidence on the record indicating that forklifts sold during the [period of review] required retrofitting." *Id.* Furthermore, Commerce explained, "[p]etitioners have * * * provided no evidence that Toyota incurred any such expenses with respect to the Toyota sales made in the current [period of review]." *Id.* Accordingly, Commerce made no adjustment in the *Final Results* for Toyota's alleged retrofitting expenses. *Id.*

## CONTENTIONS OF THE PARTIES

A. *Plaintiffs:*

Plaintiffs' first contention is that Commerce unlawfully allowed Toyota to offset its U.S. credit expense by the amount of interest income earned by TMCC on TMCC's loans to Toyota's unrelated dealers. Plaintiffs argue that a "circumstance-of-sale adjustment for credit expense must be related to the lost opportunity cost experienced by a seller to sell the product under review." (Pls.' Mem. in Support of Mot. for J. Upon Agency R. (Pls.' Br.) at 8.) Accordingly, plaintiffs maintain, in the present case "TMS's credit expense should have been calculated based on the time between the date the forklift was shipped to the dealer and the date TMS received payment for the truck." *(Id.* at 9.) Plaintiffs assert that TMS received payment from the dealers for the purchase of the trucks once the dealers obtained financing from TMCC. Upon receipt of this payment, plaintiffs argue, "the sales transaction was complete and TMS was no longer incurring any imputed credit expense." *(Id.)*

In contrast to the sales transaction, plaintiffs complain, the loan transaction between TMCC and the dealers was a separate transaction involving a distinct entity. According to plaintiffs, TMCC lent money to dealers once the sales negotiations were complete, and these financing arrangements did not affect the separately negotiated sales prices. Thus, plaintiffs assert, the interest income earned by TMCC was not credit revenue earned by TMS but instead was for the loan of money by TMCC. Plaintiffs maintain that Commerce, however, "unlawfully merged" the sales and lending transactions in calculating TMS's U.S. credit expenses. *(Id.)*

Plaintiffs further emphasize their position concerning the separate natures of the sale and lending transactions by discussing the different functions undertaken by TMS and TMCC. TMS, plaintiffs argue, sells

forklift trucks to dealers, and thus TMS's imputed credit expense relates to the truck sales. Plaintiffs assert that TMCC, however, makes loans which are financial arrangements unrelated to the sales. No evidence in the record, plaintiffs argue, suggests the unrelated dealers were obligated to borrow from TMCC or that the sales were dependent on obtaining a TMCC loan.

Contrary to Commerce's and TMS's arguments, plaintiffs maintain they did raise the issue of the deduction of interest income TMCC received from dealers in the administrative proceedings below. Plaintiffs claim to have made two arguments before Commerce relating to Toyota's claimed credit revenue. First, plaintiffs contested the offset for interest income received by TMCC from end-users. Second, plaintiffs made a broad argument that the sales and financing transactions were distinct. This second argument, plaintiffs contend, was not limited to transactions involving end-users. Furthermore, plaintiffs assert, at Commerce's hearing on this administrative review, plaintiffs' economic consultant "specifically discussed the separate nature of the transaction, not at the end-user level, but at the *dealer* level." (Pls.' Reply to Def.'s Resp. in Partial Opp'n and Def.-Intervenor's Resp. to Pls.' Mot. for J. Upon Agency R. (Pls.' Reply) at 5.) Moreover, "when viewed conceptually," plaintiffs maintain, the two arguments are clearly separate. *(Id.)* Plaintiffs contend Commerce's failure to address plaintiffs' argument specifically in relation to unrelated dealers should not preclude plaintiffs from making that argument before this Court. Furthermore, even if plaintiffs did not argue against a credit revenue offset for interest income received from dealers, plaintiffs claim that this Court may properly hear plaintiffs' argument because of an exception to the exhaustion doctrine which allows parties to raise a legal issue before the court even if not presented to the agency in the administrative review. Accordingly, plaintiffs ask this Court to remand the *Final Results* to Commerce with instructions to correct Commerce's decision to allow the offset for interest income earned by TMCC on loans to unrelated dealers.

Plaintiffs' second contention is that Commerce erred in refusing to make an adjustment for Toyota's ORS program expense as a warranty expense incurred during the period of review. Plaintiffs argue Commerce regularly adjusts dumping calculations for selling expenses incurred during the period of review but related to sales made prior to the period of review. If Commerce did not make such adjustments, plaintiffs maintain, Commerce would never account for certain expenses in its dumping calculations. (Pls.' Br. at 6 (citation omitted).)

Here, plaintiffs contend, the expenses incurred during the period of review due to the retrofitting were "a kind of warranty expense; that is, the expense was incurred to replace poorly-designed seats." *(Id.)* Plaintiffs claim that contrary to Commerce's regulations and well-established practice, however, Commerce refused to make the adjustment. "In the future," plaintiffs argue, "Toyota will likely incur similar, although not perhaps the exact same, expenses with respect to the sales

that were made during the period of review." *(Id.* at 16.) Plaintiffs argue that because Commerce did not make an adjustment for this expense in the present review, Toyota's "U.S. selling price does not properly reflect all selling expenses that will likely be incurred in the future with respect to these sales, thereby understating Toyota's dumping margins." *(Id.)* Accordingly, plaintiffs ask this Court to remand the *Final Results* to Commerce with instructions to reconsider its decision with respect to these alleged warranty expenses.

## B. *Defendant:*

In Commerce's brief to this Court, Commerce contends this Court should reject plaintiffs' argument regarding the offset to Toyota's credit expenses as barred by the doctrine of exhaustion of remedies. "[T]here is simply no excuse," Commerce argues, for plaintiffs' failure to challenge at the administrative level Toyota's claimed offset for interest income received by TMCC on loans to unrelated dealers. (Def.'s Resp. in Partial Opp'n to Pls.' Mot. for J. Upon Agency R. (Def.'s Resp.) at 7.) In fact, Commerce maintains, in the administrative proceeding below "plaintiffs themselves drew a sharp distinction between sales to Toyota's first unrelated customer and sales to end users." *(Id.)*[8] Plaintiffs' deliberate failure to raise its arguments below, defendant reasons, "denied Commerce the opportunity to fulfill the role that is intended by the statutory scheme." *(Id.* at 8 (citations omitted).) Thus, Commerce urges this Court not to entertain plaintiffs' arguments regarding the interest income offset "unless plaintiffs can adequately explain why their failure to exhaust administrative remedies should be excused." *(Id.)*

In oral argument before this Court, however, Commerce conceded plaintiffs did raise the issue of Toyota's claimed adjustment for interest income earned on financing arrangements made with unrelated dealers at the hearing below. *(See* Tr. at 64.) Nonetheless, Commerce still maintains plaintiffs have failed to exhaust their administrative remedies. *(See id.* at 65.) According to Commerce, under 19 C.F.R. § 353.38(b),[9] "the case brief defines the scope of what is considered in the hearing in the case, and in fact the Moderator of the hearing in this case specifically cautioned the parties that they could not raise issues at the hearing that they had not raised in the case brief." *(Id.* at 64.)

---

[8] Commerce quotes from the comments section of the *Final Results:*

Petitioners argue that Toyota's claimed credit revenue for its U.S. sales should be rejected because the credit revenue for certain sales is actually earned on sales by unrelated dealers to end-user customers and not on the sale from Toyota to the unrelated dealer. Petitioners state that Toyota sells forklifts in the United States to unrelated dealers and that the first unrelated sale is the sale from Toyota to the dealer. Petitioners contend that the purpose of this review, as stated in the questionnaire, is to examine sales by Toyota to the first unrelated customer. Petitioners argue that credit revenue earned on sales from the unrelated dealer to the end-user, which are financed through TMCC, is therefore irrelevant to this review, because the financing arranged by TMCC is a separate transaction from the sale of the forklift.

*Final Results,* 59 Fed. Reg. at 1379 *reprinted in* Def.'s Resp. at 8.

[9] The relevant portion of 19 C.F.R. § 353.38(b) states: "At the hearing, an interested party may make an affirmative presentation only on arguments included in that party's case brief and may make a rebuttal presentation only on arguments included in that party's rebuttal brief." 19 C.F.R. § 353.38(b) (1991).

Should this Court entertain plaintiffs' challenge regarding the interest income offset, Commerce contends it properly concluded that the interest income Toyota earned on the sale to an unrelated dealer was a circumstance of sale related to that sale. According to Commerce, it may only make a circumstance-of-sale adjustment for an expense directly related to the sale of the merchandise at issue. Commerce explains that a circumstance-of-sale adjustment for credit expense is based upon the period of time between the seller's shipment of goods to the purchaser and the seller's receipt of payment. During this time, Commerce maintains, the "seller incurs additional expenses through the process of borrowing funds pending receipt of payment or through the fact that funds are tied up due to the existence of accounts receivable." (Def.'s Resp. at 9 (citation omitted).) Thus, Commerce reasons, in this case "the credit expense adjustment should be based upon Toyota's expenses in financing the sale of forklift trucks for which it has not yet received payment. Similarly, any offset for interest income should likewise be based upon interest income that Toyota earns in financing these sales." (Id.)

Contrary to plaintiffs' assertions, Commerce argues, a direct relationship exists between TMS and TMCC because TMCC is wholly owned by Toyota. Commerce argues that in this situation, its usual practice "is to collapse the related entities and to consider the expenses incurred by the wholly owned subsidiary as incurred by the entity as a whole." (Id. at 10 (citations omitted).) Thus, Commerce contends it

> reasonably treated Toyota and its wholly owned subsidiary as a single entity and imputed the credit expenses and interest income of Toyota's wholly owned subsidiary to Toyota * * *. [T]he interest income at issue is earned by Toyota from a loan arranged by Toyota in order to finance a sale by Toyota of the merchandise subject to the antidumping duty order.

(Id.)

As to the issue of alleged warranty expenses, Commerce maintains it "failed to adequately consider plaintiffs' arguments that an adjustment should be made for the alleged warranty expenses." (Id. at 2.) Commerce therefore requests a remand on this issue so that it may reconsider "and, if necessary, further develop the administrative record." (Id.)

C. *Defendant-Intervenor:*

TMS agrees with Commerce that plaintiffs failed to exhaust their administrative remedies and urges this Court to dismiss plaintiffs' claim concerning credit revenue. TMS argues plaintiffs never briefed the issue of wholesale financing credit revenue before Commerce. In fact, TMS asserts, "[p]laintiffs drew a sharp distinction between 'wholesale' and 'retail' credit revenue before the Department—in order to assure the deduction of 'retail' credit revenue." (Def.-Intervenor's Resp. to Pls.' Mot. for J. Upon Agency R. (Def.-Intervenors' Resp.) at 4.) According to TMS, this distinction was drawn tactically, and plaintiffs relied upon it at the agency hearing. TMS complains that, as a result,

Commerce "never had an opportunity to consider the issue, make a decision, and state the reasons for its decision." *(Id.)* Likewise, TMS contends, Toyota did not defend, or have the opportunity to defend, against plaintiffs' arguments concerning wholesale financing credit revenue, "and Toyota will suffer prejudice as a result if [p]laintiffs' argument is now heard." *(Id.* at 3.) Additionally, TMS maintains plaintiffs do not fit into any of the narrowly-drawn exceptions to the exhaustion of remedies doctrine. TMS argues, "[t]his is precisely the kind of tactic that the doctrine of exhaustion of administrative remedies is designed to prevent." *(Id.* at 12 (citation omitted).)

TMS further contends Commerce's inclusion of wholesale credit revenue in Toyota's U.S. price was supported by substantial evidence on the record and is legally correct. TMS argues plaintiffs' assertions that the sales and financing were separate transactions amount to "pure speculation as to how Toyota's sales transactions occur, without regard to any facts." *(Id.* at 13.) TMS explains that "Toyota, consisting of TMS and its wholly-owned subsidiary, TMCC, incurs credit expense and earns credit revenue on its sales to its dealers, both of which were taken into account by the Department in its antidumping analysis." *(Id.* at 13–14.) This action, TMS maintains, was fully consistent with the long-standing and accepted practice of Commerce to include credit revenue in U.S. sales price. Furthermore, TMS argues, inclusion of wholesale credit revenue was proper "because credit revenue, as well as credit expense, is implicit in all sales with a delayed payment term." *(Id.* at 15.) Thus, TMS contends, the "only real issue" is whether the fact that the wholly-owned subsidiary of a sales company, instead of the sales company itself, earned the credit revenue has any bearing on Commerce's dumping analysis. *(Id.* at 15–16.)

On the issue of Toyota's retrofit expenses, TMS contends that, consistent with Commerce's long-standing practice, case law, and Commerce's regulations, Commerce properly did not make a deduction. Plaintiffs submitted no evidence, TMS argues, that any alleged retrofit expenses were incurred during the administrative review period or that the alleged expenses were related to the sales under review. In fact, TMS claims, plaintiffs admit to this Court that "'Toyota installed seats on forklift trucks sold prior to the period of review.'" *(Id.* at 19 (quoting Pls.' Br. at 16).) TMS explains that "Toyota's forklift trucks have long been manufactured and sold with the ORS" beginning well before Commerce's first administrative review. *(Id.* at 17.) Therefore, TMS reasons, "any such ORS retrofit expenses were related *solely and exclusively* to forklift trucks not subject to the administrative review at issue here." *(Id.* at 18 (citation omitted).)

TMS further contends plaintiffs' assertion that Commerce regularly adjusts antidumping calculations for expenses that are incurred during the period of review but not tied to the sales under review is legally incorrect. Instead, TMS argues, Commerce's "long-standing practice is that direct selling expenses must be directly related to the sales under

consideration." *(Id.* at 18 (citations omitted).) TMS maintains that once Commerce "is certain that a directly-related warranty expense exists but that its amount is unascertainable, then, and only then, will the Department use current or historical data on unrelated warranty expenses to estimate the directly-related warranty expenses that justify an adjustment." *(Id.* at 21.) TMS argues that here, however, any expenses incurred for the ORS retrofit are related only to prior sales. Furthermore, TMS asserts, Commerce's adjustment for warranty expenses is a "narrowly-drawn exception" that Commerce has never used to calculate unrelated product liability expenses or unrelated product recall or retrofit expenses. *(Id.* at 21 (footnote omitted).) TMS argues that the purpose for the warranty exception "is entirely inapplicable to the extraordinary one-time nature of the ORS retrofit expense." *(Id.* at 21–22.)

## STANDARD OF REVIEW

The appropriate standard for the Court's review of a final determination by Commerce is whether the agency's determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), *aff'd* 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987) (citations omitted). The Court must accord substantial weight to the agency's interpretation of the statute it administers. *American Lamb Co. v. United States,* 4 Fed. Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986) (citations omitted). Thus, the "agency's interpretation of the statute it has been entrusted by Congress to administer is to be upheld unless it is unreasonable." *U.H.F.C. Co. v. United States,* 9 Fed. Cir. (T) 1, 10, 916 F.2d 689, 698 (Fed. Cir. 1990) (citations omitted).

## DISCUSSION

A. *Exhaustion of Remedies on the Issue of Toyota's Credit Revenue Offset for Interest Income Earned on Financing Arrangements With Unrelated Dealers:*

The threshold question this Court must decide is whether plaintiffs argued against Toyota's claimed adjustment for credit revenue earned on sales to unrelated dealers in the administrative proceeding below. Upon examination of the record, this Court finds it appears plaintiffs did advance this argument to Commerce.

Plaintiffs appear to have raised the issue at the agency hearing. While plaintiffs' consultant argued against the inclusion of credit revenue earned on financing sales to end-users by distinguishing between sales

to dealers and sales to end-users,[10] plaintiffs' consultant also argued before the agency that

> the financing provided by TMCC is a separate transaction from the sale of a forklift by TMS * * *.
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*
>
> The price for the forklift is the amount the dealer paid to TMS. The price for the loan by TMCC is the interest that the dealer paid to TMCC to make the loan. These are two separate transactions.

*(Id.* at 18–20.)

Defendant argues plaintiffs' raising of the issue at oral argument does not negate the exhaustion of remedies issue because plaintiffs failed to raise the issue in their brief below. However, this Court finds plaintiffs do appear to have raised the issue in their brief to the agency. Although plaintiffs' brief below does not explain that its argument captioned "The Financing Arrangement Is A Separate Transaction That Should Not Be Merged With The Sale Price For The Forklift" is leveled against adjustments for credit revenue generated on transactions with both end-users and dealers, the brief also does not expressly limit plaintiffs' argument only to revenue earned in relation to end-users. Furthermore, this generalized argument falls within a section in plaintiffs' brief titled "THE DEPARTMENT SHOULD REJECT TOYOTA'S CLAIMED CREDIT REVENUE FOR ITS U.S. SALES." Thus, this Court rejects defendant's contention.

The Court further observes it appears plaintiffs' argument that the sale and financing of forklift trucks are two distinct transactions logically would apply to transactions involving unrelated dealers as well as those involving unrelated end-users. It is not for the Court, however, to make such a determination. It does not appear from the *Final Results* that Commerce considered the argument that Toyota's offset for credit revenue earned on the financing of sales to unrelated dealers was improper because the sale and financing of the forklifts were separate transactions. For example, in the *Final Results,* Commerce characterizes petitioners' arguments as follows:

> Petitioners argue that Toyota's claimed credit revenue for its U.S. sales should be rejected because the credit revenue for certain sales is actually earned on sales by unrelated dealers to end-user customers and not on the sale from Toyota to the unrelated dealer. Petitioners state that Toyota sells forklifts in the United States to unrelated dealers and that the first unrelated sale is the sale from Toyota to the dealer. Petitioners contend that the purpose of this review * * * is to examine sales by Toyota to the first unrelated customer. Petitioners argue that credit revenue earned on sales from

---

[10] [T]his administrative review is not concerned with the sales price and the terms of sale on sales from Toyota's unrelated dealers to end-user customers. This is because these sales are the second unrelated sale in the United States.

　　Thus, the interest revenue that's earned by TMCC for financing these end-user sales should not be included in the [D]epartment's analysis.

(Admin. Tr. at 18); *see also Id.* at 15.

the unrelated dealer to the end-user, which are financed through TMCC, is therefore irrelevant to this review, because the financing arranged by TMCC is a separate transaction from the sale of the forklift.

*Final Results,* 59 Fed. Reg. at 1379. Similarly, in responding to the above-characterized argument, Commerce sets forth the following:

In accordance with section 353.41 of the Department's regulations, we used the price to the first unrelated purchaser in the United States as the basis of U.S. price. Toyota's [U.S. price] was based on the price TMS/TIE charged its unrelated dealers. Therefore, we consider revenue generated as a result of the sale by the dealer to the end-user through a financing arrangement a separate transaction, and as such, not directly associated with the sales under review, as claimed by Toyota.

*Id.* It is not readily apparent from Commerce's response whether "separate transaction" refers to the sale from the dealer to the end-user, the financing, or both.[11]

Accordingly, this Court remands the *Final Results* to Commerce. On remand, Commerce is instructed to consider plaintiffs' argument that Toyota's credit revenue offset for interest income earned on financing arrangements made with unrelated dealers was improper because the financing and sale of the forklift trucks were separate transactions.

The Court further notes that in its papers to this Court, defendant explains its determination on the issue of Toyota's credit revenue offset as follows:

[TMCC] is wholly owned by Toyota.

Commerce's usual practice, in these circumstances, is to collapse the related entities and to consider the expenses incurred by the wholly owned subsidiary as incurred by the entity as a whole. Accordingly, Commerce reasonably treated Toyota and its wholly owned subsidiary as a single entity and imputed the credit expenses and interest income of Toyota's wholly owned subsidiary to Toyota. In sum, the interest income at issue is earned by Toyota from a loan arranged by Toyota in order to finance a sale by Toyota of the merchandise subject to the antidumping duty order.

(Def.'s Resp. at 9–10.) It does not appear, however, that Commerce reported any finding as to the corporate relationship of TMS, TMCC, and Toyota in the *Final Results* other than its statement that TMCC is a finance company related to TMS. *See Final Results,* 59 Fed. Reg. at 1378. Accordingly, if on remand Commerce determines the corporate relationship of TMS, TMCC, and Toyota is a determinative factor in its consideration of plaintiffs' argument against Toyota's credit revenue

---

[11] The Court further notes that during oral argument before this Court defendant's counsel made the following comments concerning the state of the administrative record in this case:

The reason why the Department of Commerce has consented to a remand with respect to so many issues in this case and the companion case is you've carefully gone through the record, you can't figure out what's going on, because institutionally the people who are dealing with this case have left and it's very difficult to figure out what information is there, what the information that's there represents.

(Tr. at 104–05.)

offset, Commerce is instructed to explain its finding as to that relationship and to point out what evidence on the record, if any, supports its finding.

Additionally, the Court observes that Commerce has not explained in its papers to this Court or in the *Final Results* the statutory and regulatory steps taken to adjust for credit revenue.[12] On remand, Commerce is instructed to provide an explanation of how it adjusts for credit revenue, and to state the statutory, regulatory, or other authority for making such adjustments.

B. *Whether Toyota's Alleged Retrofit Expenses Should be Accounted for in the Dumping Calculations as Warranty Expenses:*

Plaintiffs request a remand with instructions to Commerce to reconsider its decision regarding Toyota's alleged warranty expenses. Commerce agrees, explaining it "failed to adequately consider plaintiffs' arguments that an adjustment should be made for the alleged warranty expenses and a remand is therefore proper for Commerce to revisit this issue and, if necessary, further develop the administrative record." (Def.'s Resp. at 2.) TMS opposes a remand.

On defendant's representation that it did not consider adequately plaintiffs' arguments on the alleged warranty expense issue, and in light of defendant's statement to this Court at oral argument that the administrative record in this case is unclear,[13] the Court remands this issue to the agency. On remand, Commerce is instructed to make determinations with respect to the issue of whether the expenses of retrofitting forklift trucks with occupant restraint safety seats should have been deducted from U.S. price in accordance with the instructions in the order accompanying this opinion.[14]

CONCLUSION

The Court remands *Certain Internal-Combustion Industrial Forklift Trucks from Japan,* 59 Fed. Reg. 1374 (Dep't Comm. 1994) (final results) to Commerce with the following instructions. First, Commerce is to consider plaintiffs' argument that Toyota's credit revenue offset for interest income earned on financing arrangements made with unrelated dealers was improper because the financing and sale of the forklift trucks were separate transactions. If on remand Commerce determines that the corporate relationship of TMS, TMCC, and Toyota is a determinative factor in its consideration of plaintiffs' argument against Toyota's credit revenue offset, Commerce is instructed to explain its finding as to that relationship and to point out what evidence on the record, if any, supports its finding. Commerce is further instructed to provide an

---

[12] Counsel for defendant did provide a partial explanation during oral argument before this Court. *See supra* note 5. This Court, however, would like Commerce to explain clearly in its remand determination the mechanics of a credit revenue offset as instructed above and in the accompanying order.

[13] *See supra* note 11.

[14] At oral argument, this Court instructed the parties to confer and submit to the Court proposed wording for the remand order should the Court remand on this issue. *(See* Tr. at 109.) That wording is substantially incorporated into the order accompanying this opinion.

explanation of how it adjusts for credit revenue, and to state the statutory, regulatory, or other authority for making such adjustments. Second, Commerce is to make determinations with respect to the issue of whether the expenses of retrofitting forklift trucks with occupant restraint safety seats should have been deducted from U.S. price in accordance with the instructions in the order accompanying this opinion.