**NACCO MATERIALS HANDLING GROUP, INC., Independent Lift Truck Builders Union, International Association of Machinists and Aerospace Workers, International Union, Allied Industrial Workers of America (AFL–CIO), & United Shop and Service Employees, Plaintiffs,**

v.

**UNITED STATES, Defendant,**

and

**Toyota Motor Sales, U.S.A., Inc., Defendant–Intervenor.**

**Slip Op. 96–99.**
**Court No. 94–02–00096.**

United States Court of International Trade.

June 18, 1996.

Collier, Shannon, Rill & Scott (Paul C. Rosenthal, Mary T. Staley, and David C. Smith, Jr.), Washington, D.C., for plaintiffs.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Civil Division, Commercial Litigation Branch, United

States Department of Justice (Michael S. Kane), Priya Alagiri, Attorney–Advisor, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, for defendant.

Dorsey & Whitney (John B. Rehm, Munford Page Hall, II, and L. Daniel Mullaney), Washington, D.C., for defendant-intervenor Toyota Motor Sales, U.S.A., Inc.

### OPINION

CARMAN, Judge:

Plaintiffs NACCO Materials Handling Group, Inc., Independent Lift Truck Builders Union, International Association of Machinists and Aerospace Workers, International Union, Allied Industrial Workers of America (AFL–CIO), and United Shop and Service Employees (collectively "plaintiffs") challenge that aspect of the Department of Commerce's ("Department" or "Commerce") *Final Results of Redetermination Pursuant to Court Remand* (Oct. 31, 1995) (*Redetermination*) dealing with credit revenue offset. Additionally, plaintiffs have requested oral argument on the *Redetermination*. Defendant–Intervenor Toyota Motor Sales, U.S.A., Inc. ("TMS" or "defendant-intervenor") challenges that aspect of Commerce's *Redetermination* dealing with operator restraint safety seat retrofit expense. The Court has retained jurisdiction during the pendency of this action. 28 U.S.C. § 1581(c) (1988).

### BACKGROUND

A. *Procedural Background*

On January 10, 1994, Commerce published the final results of its June 1, 1989, through May 31, 1990, administrative review of the antidumping duty order on certain internal-combustion, industrial forklift trucks from Japan. *See Certain Internal–Combustion Industrial Forklift Trucks From Japan,* 59 Fed.Reg. 1374 (Dep't Comm.1994) (final results) (*Final Results*). The review covered, in part, sales made by Toyota Motor Corporation (Toyota). *Id.* at 1375.[1]

Toyota's U.S. selling division, TMS sold Toyota's forklift trucks to dealers, who sold the forklift trucks to end-users. *Id.* at 1379. TMS' related finance company, Toyota Motor Credit Corporation (TMCC), provided financing for the purchases of both dealers and end-users. *Id.* Because Commerce based United States price (USP)[2] on the price to the first unrelated purchaser in the United States, Commerce based USP on what TMS charged unrelated dealers. *Id.*[3] In claiming credit revenue for its U.S. sales, however, Toyota claimed credit revenue TMCC received from both unrelated dealers and unrelated end-users resulting from the financing TMCC supplied. *Id.*[4] In the *Final Results,* Commerce allowed the inclusion of credit revenue received from unrelated dealers, but disallowed credit revenue received from unrelated end-users. *Id.* Commerce explained that because it had based USP on the price TMS charged unrelated dealers, Commerce considered "revenue generated as a result of the sale by the dealer to the end-user through a financing arrangement a separate transaction, and as such, not directly associated with the sales under review." *Id.*

During the administrative review, plaintiffs also urged Commerce to consider costs allegedly incurred by Toyota in retrofitting its

---

**1.** The Court notes that in its papers, defendant-intervenor abbreviates "Toyota Motor Sales, U.S.A., Inc." as "TMS" and "Toyota," whereas plaintiffs abbreviate "Toyota Motor Sales, Inc." as "TMS." Plaintiffs also complain that in part of the *Redetermination,* Commerce "repeatedly refers to 'Toyota.' Yet, nowhere does the Department describe which 'Toyota' entity it refers." (Pls.' Resp. to the Commerce Dep't's Final Results of Redetermination (Pls.' Resp.) at 4 (discussing the *Redetermination* at 4).) When not quoting a party, the Court's designations will mirror those used in the *Federal Register.*

**2.** The Court notes that the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat.

4809 (1994), amended the antidumping statutes in many respects. Because Commerce's review in this case took place before the amendments took effect, however, this case is governed by the prior statutory scheme.

**3.** In the *Final Results,* Commerce explains Toyota's USP "was based on the price TMS/TIE charged its unrelated dealers." *Final Results,* 59 Fed.Reg. at 1379. TIE is the Toyota Industrial Equipment Division of TMS. *Id.* at 1378.

**4.** Toyota refers to these financing arrangements as "wholesale" and "retail" financing, respectively.

forklifts with redesigned seats under an operator restraint safety seat (ORS) program as direct U.S. selling expenses. *Id.* at 1378. Toyota argued that any costs incurred due to the retrofit were only for forklifts imported and sold prior to the period of review (POR). *Id.* In the *Final Results,* Commerce concluded "there [was] no evidence on the record indicating that forklifts sold during the POR required retrofitting." *Id.* Furthermore, Commerce explained, "[p]etitioners have ... provided no evidence that Toyota incurred any such expenses with respect to the Toyota sales made in the current POR." *Id.* Accordingly, Commerce made no adjustment in the *Final Results* for Toyota's alleged retrofitting expenses. *Id.*

In *NACCO Materials Handling Group, Inc. v. United States,* 896 F.Supp. 1248 (CIT 1995), this Court remanded the *Final Results* and ordered Commerce first

> to consider plaintiffs' argument that Toyota's credit revenue offset for interest income earned on financing arrangements made with unrelated dealers was improper because the financing and sale of the forklift trucks were separate transactions. If on remand Commerce determines that the corporate relationship of TMS, TMCC, and Toyota is a determinative factor in its consideration of plaintiffs' argument against Toyota's credit revenue offset, Commerce is instructed to explain its finding as to that relationship and to point out what evidence on the record, if any, supports its finding. Commerce is further instructed to provide an explanation of how it adjusts

for credit revenue, and to state the statutory, regulatory, or other authority for making such adjustments. Second, Commerce is to make determinations with respect to the issue of whether the expenses of retrofitting forklift trucks with occupant restraint safety seats should have been deducted from U.S. price....[5]

*NACCO,* 896 F.Supp. at 1257.

### B. *Commerce's* Redetermination

#### 1. Toyota's Credit Revenue Offset for TMCC's Wholesale Financing Credit Revenue

In the *Redetermination,* Commerce indicates TMS is a wholly-owned subsidiary of Toyota and TMCC is a wholly-owned subsidiary of TMS. *Redetermination* at 3. Commerce found this corporate relationship a determinative factor in its consideration of plaintiffs' argument against Toyota's credit revenue offset. *Id.* Commerce explains its practice is to " 'combine the ... activities of a parent and subsidiary when the parent exercises control over the subsidiary (i.e., meets the requirements for consolidation)' and to treat the entities as a consolidated group." *Id.* (quoting *Certain Carbon Steel Butt–Weld Pipe Fittings From Thailand,* 57 Fed.Reg. 21,065, 21,069 (Dep't Comm.1992) (final determ.) (*Carbon Steel Butt–Weld Pipe Fittings* ) and citing *New Minivans From Japan,* 57 Fed.Reg. 21,937, 21,946 (Dep't Comm.1992) (final determ.) (*New Minivans* )). In this case, Commerce found control by TMS over TMCC to be clearly evident by the record. *Id.*[6] Thus,

> ... if the Department determines that ORS retrofit expenses were incurred during the administrative review period, that they were not deducted from United States price, and that they were warranty expenses, the Department should recalculate Toyota's less-than-fair-value margins, deducting all warranty expenses from United States price....

*NACCO,* 896 F.Supp. at 1258.

---

**5.** More specifically, on the ORS retrofit issue, this Court ordered Commerce to

> make the following determinations with respect to the issue of whether the expenses of retrofitting forklift trucks with occupant restraint safety seats ... should have been deducted from United States price: (1) whether the Department should have investigated whether ORS retrofit expenses were incurred during the period of review, in light of the facts and arguments presented to the Department in Petitioners' Case Brief, Confidential Record 36, at 2–3; and if so, (2) whether Toyota incurred any ORS retrofit expenses during the period of review; and if so, (3) whether these expenses were deducted from United States price; and if not, (4) whether these ORS retrofit expenses were warranty expenses; ...

**6.** Commerce explains:

> In Section A–2 of Toyota's questionnaire response to the Department (December 12, 1990), Toyota explains the relationship between Toyota's related entities. TMC wholly owns (100% ownership) TMS, and TMS wholly owns TMCC. Thus, there is clear evidence of control by parent over subsidiary, a fact undisputed by petitioners.

[t]reating the financing and sale of the forklift truck as one transaction in this case is based upon the Department's practice of combining the activities of the consolidated group. The Department, therefore, treated Toyota and its related entities as a consolidated group, and treated the operations of the financing entity, TMCC, as a member of the consolidated group. Thus, when TMS makes a sale to the unrelated dealer, and when TMCC finances that same sale to the unrelated dealer, the credit expense incurred and the interest revenue earned affects Toyota as a corporate entity and is based on the sale and financing arrangement made between Toyota as a corporate entity and the unrelated dealer.

*Id.* at 3–4 (citations omitted).[7]

Commerce addressed "plaintiffs' argument that Toyota's credit revenue offset for interest income earned on financing arrangements made with unrelated dealers was improper because, according to the plaintiffs, the financing and sale of the forklift trucks were separate transactions" as follows. *Id.* at 5 (citation omitted). Based on Commerce's practice of consolidation in antidumping cases, Commerce regarded "the sale by TMS and the financing by TMCC of that sale as one transaction from an antidumping analysis perspective." *Id.* Because Commerce uses the price to the first unrelated purchaser in the United States as the basis of USP, Commerce:

> used the price TMS charged its unrelated dealers as Toyota's USP and made the

proper adjustments to USP with respect to Toyota's credit expense offset for interest income earned on the financing arrangements made between Toyota and the unrelated dealer. The sale and the financing of the sale are made by one entity, the Toyota consolidated group, and must be treated accordingly in an antidumping analysis.

*Id.*

2. The ORS Retrofit Issue

Commerce determined that ORS seat retrofit expenses were incurred during the POR and that they are classifiable as warranty expenses. According to Commerce, warranty expenses are usually based on the repair or replacement cost for a defective item. Here, Commerce explains, Toyota incurred the expenses at issue as a result of replacing defective seats on the subject merchandise. Additionally,

> because warranty expenses are usually incurred at some time after a sale, the Department usually bases its calculation of per-unit warranty costs of current period expenses on historical information. Historical data are used as a measure by which to project future warranty expense incurred by a respondent on the sales reviewed.... Toyota reported that it incurred ORS retrofit expenses during the POR and that it reported certain of these expenses under the "Other U.S. Expenses" category. Toyota also reported additional ORS retrofit expenses that were incurred in Japan during the POR. Therefore, we

---

*Redetermination* at 3 n. 3.

**7.** Commerce explains the mechanics of the adjustment for TMCC's wholesale credit revenue as follows:

> In an exporter's sales price ... situation, as we have here, we make an adjustment to USP ... for credit expense when the expense is incurred by or for the account of the exporter in the United States, as provided for under 772(e)(2) of the Tariff Act of 1930.... The Department bases the adjustment on net credit expense to the respondent, and uses the information submitted by respondent in the calculation of net credit expense. In this case, Toyota incurs a credit expense on the sale of a forklift truck by providing financing which permits a customer (a dealer) a period of time to pay for

the truck. Likewise, Toyota generates credit revenue, or interest income, by charging the dealer interest for the funds borrowed when Toyota extends financing to the unrelated dealer for the sale of the particular forklift truck. Thus, when interest income is earned on the same sale for which credit expense is incurred, the Department makes an adjustment for the net credit expense on the sale at issue. The sale at issue is the sale made by Toyota, the whole entity, to the first unrelated purchaser. The Department has, therefore, made the appropriate adjustment to Toyota's credit expense by offsetting the credit expense with the interest income earned on the financing arrangements made between Toyota and the unrelated dealer on the same sale of the forklift truck.

*Redetermination* at 4–5.

have determined to use current period expenses as the basis for the adjustment. In accordance with our practice, we have treated the variable portion of the expense as direct, and the fixed expense portion as indirect.

*Id.* at 6 (citations omitted). Commerce recalculated Toyota's margin, accounting for the full amount of the ORS expenses during the POR on the subject merchandise and reflecting its classification of those expenses.

## STANDARD OF REVIEW

The standard of review for this Court's review of a remand determination by Commerce is whether that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988) (current version at 19 U.S.C. § 1516a(b)(1)(B)(i) (1994)).

## DISCUSSION

### A. *Toyota's Credit Revenue Offset for Wholesale Financing by TMCC*

Plaintiffs contest this aspect of Commerce's *Redetermination.* The foundation for many of plaintiffs' arguments is plaintiffs' allegation that "[t]he loan of money is a separate transaction that is unrelated to the price negotiated for the sale of a forklift truck." (Pls.' Resp. at 1.) First, plaintiffs argue that circumstance-of-sale adjustments must relate to the *sale* of a product. (*Id.* at 2 (citing 19 U.S.C. § 1677b(a)(4)(B); *Smith–Corona Group v. United States,* 1 Fed.Cir. (T) 130, 143, 713 F.2d 1568, 1580 (1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984); 19 C.F.R. § 353.56).) Second, plaintiffs contend "any claimed adjustment for credit expense must be related not only to the sale of the product subject to review but also to the lost opportunity cost experienced by a seller to sell the product under review." (*Id.* at 3.) Third, "the transaction for which credit expenses are incurred," plaintiffs maintain, "must relate to the sales negotiation process between TMS and the dealer." (*Id.* at 6.) Here however, plaintiffs argue, nothing in the record suggests any nexus between the dealer's transaction with TMS and the dealer's transaction with TMCC.

Plaintiffs also attack Commerce's finding that the relationship between TMCC and TMS was a determinative factor in Commerce's decision, and claim Commerce failed to provide a reasonable explanation for this conclusion. Plaintiffs argue Commerce does not have a general policy of consolidating related entities. Furthermore, they claim, the decisions cited by the Department in support of its alleged general policy of consolidating related entities

were limited to the calculation of interest expenses in cost of production or constructed value investigations and do not concern the calculation of imputed credit expenses for sales of the product under investigation.... [F]or purposes of calculating a respondent's *actual* interest expenses in *constructed value or cost of production investigation,* the Department consolidates the interest expenses incurred by a parent and its subsidiary. There is a very specific reason for doing so.... [T]he Department is attempting to ascertain the interest expense related to financing the working capital for the *production* of the subject merchandise. The Department consolidates the companies to calculate a respondent's *actual* interest expense in these instances because of the fungible nature of working capital used to finance the manufacture of products. The Department's position is that consolidation is required because a parent company has the authority to allocate funds for manufacturing purposes as it deems necessary.

(*Id.* at 6–7 (discussing *Carbon Steel Butt–Weld Pipe Fittings* and *New Minivans*) (citation omitted).) In contrast, plaintiffs argue, Commerce does not have a practice of consolidating related entities to calculate a respondent's selling expense. Instead, Commerce looks to each individual corporate entity to determine the selling expenses incurred that are related to the sale of the subject merchandise.[8]

---

8. Even if consolidation did apply, plaintiffs argue, Commerce would be required to exclude interest income on TMCC's long-term loans under that policy. (Pls.' Resp. at 9 (discussing *New*

Defendant–Intervenor supports Commerce's determination on this issue, and stresses two points. First, defendant-intervenor argues Commerce "has always recognized that the 'credit' extended to a customer—the payment terms under which the product is sold—dictates to a large extent both the price paid by the customer and the cost incurred by the seller." (Def.–Intervenor, TMS' Resp. to Def.'s Final Results of Redetermination Pursuant to Ct. Remand (TMS' Resp.) at 2.) Commerce routinely takes both into account, defendant-intervenor maintains, in antidumping analyses.[9] "Given the fact that credit or financing arrangements for the sale of subject merchandise are *always* a part of the Department's antidumping analysis," defendant-intervenor continues, "the *only* question presented is whether this case is unusual enough to require an exception to the well-established rule. There is *not a single shred of evidence* that an exception should be made." (*Id.* at 3.)

Second, defendant-intervenor defends Commerce's decision to use prices paid by related dealers in Japan as a basis for foreign market value while refusing to use prices " 'paid' to TMS by TMCC, a related entity, in the United States. In other words, the Department merged TMCC with TMS for purposes of its antidumping duty analysis, but decided not to merge related dealers in Japan with [Toyota]." (*Id.*) Defendant–Intervenor argues that unlike Commerce's calculation of USP, specific regulatory authority permits Commerce to base foreign market value on sales to related dealers in the home market, if Commerce is satisfied those sales were at arm's length. (*Id.* at 3–4 (citing 19 U.S.C. § 1677(13); 19 U.S.C. § 1677a(c); 19 C.F.R. § 353.41(c); 19 C.F.R. § 353.45(a)).) "[T]he only permissible U.S. price is that paid by the unrelated customer. That price is paid to TMCC, and it includes credit revenue. The TMCC–TMS 'price,' whether 'arm's-length' or not, may not be used as U.S. price under any circumstances." (*Id.* at 4.)

Commerce claims to have a practice of combining a parent's activities with those of its subsidiary when the "requirements for consolidation" are met. In support of this claim, Commerce cites to *Carbon Steel Butt–Weld Pipe Fittings* and *New Minivans*. In *Carbon Steel Butt–Weld Pipe Fittings*, the respondent argued Commerce should not consolidate the company under investigation with its parent company in calculating interest expense for cost of production (COP) and constructed value (CV) where the parent and the subsidiary do not consolidate their financial statements. *Carbon Steel Butt–Weld Pipe Fittings*, 57 Fed.Reg. at 21,069. "In those instances where the parent and subsidiary do not consolidate their financial statements," respondents argued, "the Department combines interest expense of the parent and its subsidiary only when there is a showing that the parent has provided substantial financing to the subsidiary." Commerce responded in part as follows:

> [W]e should consolidate the interest expense. The Department calculates the representative financing expenses of a subsidiary based upon the expenses incurred by the consolidated entity because of the fungible nature of capital. . . . Contrary to [respondent's] presumptions, it is the Department's policy to combine the financing activities of a parent and subsidiary when the parent exercises control over the subsidiary (*i.e.*, meets the requirements for consolidation).
>
> Although [the parent and the subsidiary] chose not to prepare consolidated financial statements, [the parent] nevertheless maintains control over [the subsidiary's] operations. Expenses incurred on behalf of a subsidiary are reflective of the financing costs incurred in production and are appropriately included in the COP or CV regardless of the country in which the expenses are reported. Therefore, the De-

---

*Minivans*, 57 Fed.Reg. at 21,948).) Plaintiffs further argue that if consolidation did apply, Commerce should have applied that principle to all transactions, namely, to those involving Toyota's financial institution in Japan, Toyota Finance Corporation.

**9.** Defendant–Intervenor also points to 19 U.S.C. § 1677b(a)(4) and 19 C.F.R. § 353.56(a)(2) ("Differences in circumstances of sale for which the Secretary will make reasonable allowances normally are those involving differences in . . . credit terms. . . .").

partment combined the financing expenses of the parent and subsidiary....

*Id.*

In *New Minivans,* Commerce rejected a respondent's claim that Commerce should calculate net interest expense incurred in production of the subject merchandise using "non-consolidated interest income and expense as the best reflection of the borrowing costs incurred by that company to fund its automobile manufacturing operations." *New Minivans,* 57 Fed.Reg. at 21,945. In so doing, Commerce explained it followed its

well-established practice of deriving net financing costs based on the borrowing experience of the consolidated group of companies. The Department has followed this practice in those cases involving consolidated groups whose member companies are involved in a wide variety of business activities. Our practice is based on the fact that the group's parent, primary operating company, or other controlling entity, because of its influential ownership interest, has the power to determine the capital structure of each member company within the group.

... According to generally accepted accounting principles (GAAP), in most circumstances, majority equity ownership is *prima facie* evidence of corporate control.

*Id.* at 21,946 (citations omitted). Commerce also addressed respondent's argument that, if Commerce did use a consolidated interest expense calculation, the respondent's related financing company warranted special treatment because the financing company

operates like a bank and, as such, its operating revenues are derived from interest income on auto loans. [Respondent] contends that if the Department includes all of [the financing company's] interest expense in its net interest expense calculation, equity dictates that this expense should be offset by all of [the financing company's] interest income including that earned from automobile installment loans which, in a non-financial entity, would be classified as interest income.

*Id.* In response, Commerce

determined that, as a member of a consolidated group of companies, the operations of a financing company remain under the controlling influence of the group. Like other members of the consolidated group, the financing company's capital structure is largely determined within the group. Consequently, its interest income and expenses are as much a part of the group's overall borrowing experience as any other member company.... [W]e note that, while we have included in our calculation of [respondent's] net interest expense the interest income earned by [the financing company] on its short-term investments of working capital, we have excluded [its] installment loan revenue. We consider these loans to be long-term investments. The Department's traditional practice has been to exclude income earned from such investments since it does not reflect working capital investments available for the group's daily business activities.

*Id.* (citations omitted).

As discussed above, plaintiffs argue the consolidations used in *New Minivans* and *Carbon Steel Butt–Weld Pipe Fittings* were limited to calculation of interest expense in cost of production or constructed value investigations. The Court cannot discern Commerce's reasoning for applying these principles to the present case, however, because in the *Redetermination* Commerce merely states that consolidation is the Department's practice " 'when the parent exercises control over the subsidiary,' " and then cites to *New Minivans* and *Carbon Steel Butt–Weld Pipe Fittings.* In addition to the lack of clarity regarding whether this "practice" of consolidation applies generally in antidumping determinations and in this case specifically, Commerce never explains just what the "requirements for consolidation" consist of. This Court finds Commerce's explanation in the *Redetermination* is so sparse, Commerce has failed to provide this Court with a sufficient explanation to enable it to rule on the agency's determination. *See, e.g., Conoco, Inc. v. U.S. Foreign–Trade Zones Bd.,* 855 F.Supp. 1306, 1312 (1994) (finding a lack of clarity in the agency's decision prevented the Court from discerning the path taken by the agency and "improperly require[d] the Court to 'supply a reasoned basis for the [agency's]

action that the [agency] itself" " did not give) (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)), *aff'd sub nom. Citgo Petroleum Corp. v. U.S. Foreign–Trade Zones Bd.*, 83 F.3d 397 (Fed. Cir.1996).[10] Accordingly, this Court remands this issue to Commerce for further explication. On remand, Commerce is to: (1) explain whether Commerce has a general practice of consolidating parent companies and subsidiaries in antidumping determinations, and if so, (a) state what statutory and regulatory authority and case law supports this practice, and (b) provide a list of citations of determinations in which Commerce has applied its practice; (2) explain whether Commerce has been using consolidation only in the calculation of COP or CV, and if so, explain Commerce's reasoning and authority—statutory, regulatory, and case law—for extending this practice to the present case; (3) explain what the "requirements for control" are and how they are met, if they are met, in the present case; (4) explain whether, in accordance with *New Minivans* and/or any Department practice, statute, or regulation, Commerce is required to differentiate long-term loans from other loans for the purpose of excluding interest income on TMCC's long-term loans.

The Court further notes it would have difficulty upholding as based on substantial evidence Commerce's finding that TMS' control over TMCC is "clearly evident by the record." *See Redetermination* at 3 (footnote omitted). It would appear the sole support Commerce provides for this finding is the 100% ownership of TMCC by TMS, and of TMS by Toyota. Presumably, Commerce is

basing its finding on its statement in *New Minivans* that under GAAP, "in most circumstances, majority equity ownership is *prima facie* evidence of corporate control." *New Minivans*, 57 Fed.Reg. at 21,946 (citation omitted). The Court orders Commerce on remand to point out additional evidence on the record supporting Commerce's finding of control sufficient to justify consolidation, and to reopen the record if necessary. Additionally, Commerce should readdress plaintiffs' argument that the sale and financing of the forklift trucks were separate transactions if necessary in light of any of Commerce's findings on remand.

## B. *The ORS Retrofit Issue*

Defendant–Intervenor urges this Court to hold that Commerce's *Final Results* stand insofar as the ORS retrofit issue is concerned. Defendant–Intervenor admits Toyota incurred ORS retrofit expenses during the period of review, and that "[t]hese expenses were partially deducted from United States price, as the Department correctly determined." (TMS' Resp. at 7.) Defendant–Intervenor argues, however, that the ORS expenses are not warranty expenses. First, according to defendant-intervenor, the ORS expenses were not pursuant to a warranty obligation and therefore cannot be treated as warranty expenses. Additionally, "the ORS retrofit was a one-time, extraordinary event that was directly related to sales made well before the administrative review period." (*Id.* at 8.) [11] Thus, defendant-intervenor argues, Commerce should not deduct the ORS retrofit expenses from USP either as warranty or indirect expenses.[12]

10. The Court also notes the following comments from counsel for Commerce during oral argument before this Court prior to remand:

> The reason why the Department of Commerce has consented to a remand with respect to so many issues in this case and the companion case is you've carefully gone through the record, you can't figure out what's going on, because institutionally the people who are dealing with this case have left and it's very difficult to figure out what information is there, what the information that's there represents.... In many ways with respect to some of these issues it's almost as if we're starting from scratch because the record is so indecipherable.

(Tr. at 104–05.) Notwithstanding any deficiencies in the record and the purported difficulties in deciphering the record, the agency must advance a reasoned basis for its actions.

11. Defendant–Intervenor adds "that Toyota incurred expense over a period of time for this one-time extraordinary event does not make the nature of this expense recurring or on-going." (TMS' Resp. at 8 n. 4.)

12. In support of its argument that the ORS retrofit expenses are not warranty expenses, defendant-intervenor also quotes as follows from one of its submissions to Commerce during the remand proceeding:

Second, defendant-intervenor attacks what it characterizes as Commerce's determination "that, even if an expense is not a warranty—and the Department does not and cannot assert that these expenses were paid pursuant to any warranty—the Department will treat the expenses as if they were a warranty." (*Id.* at 9 (discussing *Redetermination* at 13) ("The duration of a warranty contract does not dictate the Department's treatment of a warranty or warranty-like expense. If, in all respects, the expense is consistent with the nature of a warranty expense, it is irrelevant whether the respondent views the expense as incurred pursuant to an express or implied warranty.").) Defendant–Intervenor finds two faults with Commerce's analysis. First, defendant-intervenor finds Commerce's actions contrary to the remand order, "which directs the Department to make an adjustment only if it finds that the ORS expenses *were* warranty expenses." (*Id.*) Second, defendant-intervenor argues Commerce's analysis runs contrary to the principle of warranty adjustments:

> Price adjustments are made for warranty because both seller and buyer know at the time of sale that there is a warranty obligation and that certain costs will be incurred to meet this obligation. If there is no warranty obligation at the time of sale, then there are no warranty expenses directly related to the sale.

(*Id.* (citing *Drycleaning Machinery From West Germany*, 50 Fed.Reg. 32,154, 32,155 (Dep't Comm.1985) (final results)).)[13]

"ORS expenses were entirely unrelated to warranty, and, unlike warranty, were not an obligation assumed by Toyota at the time of sale. Indeed, all of the forklift trucks retrofitted during the AR2 period, having been sold many years before, were well outside of the 1–year warranty period applicable to such trucks. Eligibility for the ORS retrofit was not tied to warranty periods—an eligible forklift truck qualified for the ORS retrofit, regardless of whether the forklift truck was still covered by warranty. ORS expenses were an extraordinary, one-time expenses incurred solely on behalf of discontinued series of forklift trucks." (TMS' Resp. at 8 (quoting Remand Pub.R. 1 at 2–3).)

**13.** Defendant–Intervenor had also argued in its *Redetermination* comments to this Court that plaintiffs did not raise the ORS expense issue below in a timely fashion. (*See* TMS' Resp. at 5–

■ The Court cannot discern from the *Redetermination* whether Commerce has adjusted for ORS retrofit expenses as a warranty expense attributable to the sales under consideration, or whether Commerce is attempting to capture expenses expended during the POR but attributable to sales from a prior POR. For example, in the *Redetermination* Commerce states, "There is no dispute that Toyota incurred expenses for ORS retrofitting during the POR for the replacement of seats on forklift trucks subject to the order." *Redetermination* at 13. This does not necessarily mean, however, that Commerce is attributing the ORS retrofit expenses to the sales made during the POR under review. The Court notes Commerce also states, "[G]iven the fact that certain forklift trucks still require retrofitting with the ORS seats, and Toyota's history of incurring this expense, it is likely that Toyota will incur ORS seat retrofit expenses in the future." *Id.* Commerce has not explained, however, whether it has determined that ORS retrofit expenses will be incurred in the future on forklift trucks sold during the POR under review. It is unclear whether the "certain forklift trucks [that] still require retrofitting" were sold during the POR under review, or whether those trucks were sold during a prior POR but have for some reason not yet been retrofitted.[14]

Accordingly, the Court remands on the ORS retrofit issue as well. *See, e.g., Conoco,*

7.) In a subsequent letter, however, defendant-intervenor informed this Court:

> It has been brought to Toyota's attention by the Department of Commerce that plaintiffs did raise this issue [of the ORS retrofit] in its letter to the Department of Commerce of April 12, 1991, prior to the publication of the preliminary determination. Therefore, Toyota withdraws its comment that the ORS issue was not timely raised. The withdrawal of this comment, does not, however, change the fact the [sic] the ORS expenses are not warranty expenses and should not be treated as such. (*NACCO Materials Handling Group, Inc. v. United States*, No. 94–02–00096 (CIT Nov. 29, 1995) (letter from Dorsey & Whitney).)

**14.** According to defendant-intervenor, the forklift trucks that require retrofitting are a discontinued series. (*See* TMS' Resp. at 8.)

*Inc.*, 855 F.Supp. at 1312 (explaining that the agency "and not the Court bears the burden of 'articulat[ing] a satisfactory explanation for its action including a rational connection between the facts found that the choice made.'") (citation omitted). On remand, Commerce is to: (1) explain whether and why the ORS retrofit expenses are warranty expenses, and if so, explain under what statutory and regulatory authority, and case law, Commerce has classified them as warranty expenses; (2) explain whether the ORS retrofit expenses at issue are related to sales made during the POR at issue, and if not, what statutory and regulatory authority authorizes Commerce's actions; (3) explain whether the forklift trucks sold during the POR at issue were manufactured with the same defective seat which requires retrofitting, such that the forklift trucks sold during the POR at issue will or should require retrofitting in the future; and (4) if the ORS retrofit expenses were incurred due to forklift trucks sold during a prior POR, explain whether Commerce is treating the ORS retrofit expenses at issue as a basis for estimating warranty expenses for forklift trucks sold during the POR under review.

## C. *Motion for Oral Argument*

Plaintiffs have submitted a motion requesting oral argument on the *Redetermination,* which defendant-intervenor opposes. Given the Court's remand on both issues, the Court denies plaintiffs' present motion requesting oral argument on the *Redetermination.*

### CONCLUSION

After considering Commerce's *Redetermination* as well as the parties' arguments, this Court remands Commerce's *Final Results of Redetermination Pursuant to Court Remand* (Oct. 31, 1995) (revisiting aspects of *Certain Internal–Combustion Industrial Forklift Trucks From Japan,* 59 Fed.Reg. 1374 (Dep't Comm.1994) (final results)) on the issues of credit revenue offset and ORS retrofit expense. On the issue of credit revenue offset, on remand, Commerce is to: (1) explain whether Commerce has a general practice of consolidating parent companies and subsidiaries in antidumping determinations, and if so, (a) state what statutory and regulatory authority and case law supports this practice, and (b) provide a list of citations of determinations in which Commerce has applied its practice; (2) explain whether Commerce has been using consolidation only in the calculation of COP or CV, and if so, explain Commerce's reasoning and authority—statutory, regulatory, and case law—for extending this practice to the present case; (3) explain what the "requirements for control" are and how they are met, if they are met, in the present case; (4) explain whether, in accordance with *New Minivans* and/or any Department practice, statute, or regulation, Commerce is required to differentiate long-term loans from other loans for the purpose of excluding interest income on TMCC's long-term loans; (5) point out what evidence on the record supports a finding of control, and any evidence supporting consolidation, in the present case, and reopen the record if necessary; and (6) if necessary in light of any of Commerce's findings on remand, readdress plaintiffs' argument that the sale and financing of the forklift trucks were separate transactions. On the issue of ORS retrofit expenses, on remand, Commerce is to: (1) explain whether and why the ORS retrofit expenses are warranty expenses, and if so, explain under what statutory and regulatory authority, and case law, Commerce has classified them as warranty expenses; (2) explain whether the ORS retrofit expenses at issue are related to sales made during the POR at issue, and if not, what statutory and regulatory authority authorizes Commerce's actions; (3) explain whether the forklift trucks sold during the POR at issue were manufactured with the same defective seat which requires retrofitting, such that the forklift trucks sold during the POR at issue will or should require retrofitting in the future; and (4) if the ORS retrofit expenses were incurred due to forklift trucks sold during a prior POR, explain whether Commerce is treating the ORS retrofit expenses at issue as a basis for estimating warranty expenses for trucks sold during the POR under review. Commerce should also perform any recalculations necessary to effect its remand determination. The Court denies plaintiffs' motion for oral argument on the *Redetermination.*